**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| CATERPILLAR FINANCIAL SERVICES CORPORATION )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>PEOPLES NATIONAL BANK, N.A. )<br>)<br>Defendant. ) | CIVIL NO. 10-298-GPM |

## MEMORANDUM AND ORDER

**MURPHY, District Judge:**

Plaintiff, Caterpillar Financial Services Corporation ("Caterpillar"), claims that Peoples National Bank ("The Bank") converted its property and interfered with its contract with S Coal Company ("S Coal").[1] Caterpillar and The Bank made secured loans to S Coal in 2006. The Bank

---

[1] The Court notes it has reviewed the issue of federal subject matter jurisdiction. *See Foster v. Hill*, 497 F.3d 695, 696-97 (7th Cir. 2007) ("It is the responsibility of a court to make an independent evaluation of whether subject matter jurisdiction exists in every case."). The Court is satisfied of its jurisdiction pursuant to 28 U.S.C § 1332(a). Caterpillar is a Delaware Corporation with its principal place of business in Nashville, Tennessee. A corporation, for diversity purposes, is a citizen of both the state where it is incorporated and the state where it maintains its principal place of business. *See* 28 U.S.C. § 1332(c)(1); *Metropolitan Life Ins. Co. v. Estates of Cammon*, 929 F.2d 1220, 1223 (7th Cir. 1991). Caterpillar is therefore a citizen of Delaware and Tennessee. The Bank is a national association with its principal place of business and corporate office in Illinois. The state listed in The Bank's organizational certificate is Illinois. Pursuant to 28 U.S.C. § 1348, the Bank is a citizen of Illinois. Although Caterpillar withdrew its claims against S Coal prior to trial, S Coal's presence did not complicate the Court's diversity jurisdiction. S Coal was an Illinois corporation with its former principal place of business in Illinois. Under Illinois law, a dissolved corporation can sue and be sued in its own name. 805 ILCS 5/12.30. Since Illinois allows S Coal to sue and be sued in its own name, S Coal's citizenship, for diversity purposes, is the state where it was incorporated and the state where it maintained its principal place of business. *See Wild v. Subscription Plus, Inc.*, 292 F.3d

made additional loans to S Coal in 2008 and 2009. When S Coal went under in late 2009, both lenders attempted to exercise their rights as secured creditors. The Bank obtained possession of and sold the disputed collateral.

## I. FACTS

In the summer of 2006, S Coal needed additional financing to purchase equipment and bring current some delinquent accounts payable. The Bank loaned S Coal $6,900,000.00 and Caterpillar loaned S Coal $6,800,000.00. As structured, both lenders took security interests in separate pools of collateral. The pool of collateral Caterpillar took a security interest in is the collateral in dispute here. The disputed collateral is approximately 35 pieces of mining equipment. At the time of this refinancing, S Coal was already indebted to Peabody Energy Corporation ("Peabody").

Caterpillar took a security interest in its pool of collateral through a series of agreements and by using a special purpose entity. In an escrow agreement dated July 14, 2006, S Coal transferred title to the collateral to PEC Equipment Company LLC ("PECEC"). PECEC is an affiliate of Peabody and held title to the collateral, subject to Caterpillar's security interest.

PECEC is important here because under the terms of the escrow agreement, PECEC functioned as the special purpose entity. Special purpose entities are designed to protect a lender's collateral in the event of a debtor's default or bankruptcy. Here, PECEC protected both Caterpillar and Peabody if S Coal ever encountered financial difficulty. In the event S Coal defaulted, Peabody could buy out Caterpillar's position in the collateral and continue S Coal's mining operation. If S

---

526, 528-29(7th Cir. 2002); *Colon v. SmithKline Beecham Corp.*, No. 09-cv-1073-GPM, 2010 WL 46523, 2010 U.S. Dist. LEXIS 544, at *17 (S.D. Ill. Jan. 5, 2010). S Coal, therefore, is a citizen of Illinois. Finally, the amount in controversy, exclusive of interest and costs, must exceed $75,000.00. *See* 28 U.S.C. § 1332(a)(1). Here, there is no dispute the amount in controversy exceeds $75,000.00. The Court is satisfied of its subject matter jurisdiction.

Coal filed for bankruptcy, creditors could not assert an interest in the collateral because S Coal did not hold title to the collateral.

Next, on July 27, 2006, Caterpillar and S Coal executed a collateral control agreement, a promissory note, and a security agreement for the loan. The collateral control agreement gave S Coal possession of the collateral and the right to use the collateral at S Coal's mining operation. A commercial security guarantee from Peabody accompanied the security agreement and promissory note. By this guarantee, Peabody agreed to pay as much as 30% of the promissory note if S Coal defaulted.

Caterpillar followed up by filling two financing statements in August 2006: one in Delaware against PECEC and the other in Illinois against S Coal.

The Bank's loan package with S Coal was backed by a security interest in coal reserves and nine pieces of equipment not implicated by this lawsuit. Peabody also gave The Bank a commercial security guarantee, promising to pay a portion of the note if S Coal defaulted.

In September 2008, S Coal obtained an additional loan from The Bank. The Bank gave S Coal a promissary note that included a cross collateralization clause and a commercial security agreement. In preparing for this loan, The Bank found a September 12, 2005 recorded financing statement that recited a security agreement by S Coal in favor of Peabody. The 2005 financing statement purported to cover *all* of S Coal's assets. The Bank then bargained for and obtained a subordination agreement from Peabody that was finalized July 29, 2008. The Bank then filed its own financing statement with the Illinois Secretary of State on August 27, 2008.

At this point both The Bank and Caterpillar had blundered. Caterpillar had inadvertently failed to obtain a surrender of Peabody's superior security interest as part of its 2006 loan. And, The

Bank had failed to obtain the *security agreement* recited in Peabody's 2005 financing statement.

In late 2009, S Coal defaulted on its obligations to both Caterpillar and The Bank. After this default, Caterpillar scrambled and belatedly obtained the documentation it thought it obtained from Peabody in 2006. The Bank *apparently* never obtained the security agreement referenced in Peabody's 2005 financing statement. This security agreement is central to The Bank's argument that it had a superior interest in the disputed collateral. *Apparently*, though, is the correct qualifier because the security agreement was not introduced into evidence or produced during the discovery process. It is difficult to imagine, with the benefit of hindsight, the security agreement was not in The Bank's loan file if it was material to The Bank's 2008 loan package.

After S Coal defaulted, Peabody made good on its guarantees to both Caterpillar and The Bank. In all, Peabody paid Caterpillar $966,000.00 and The Bank $1,800,000.00.

The Bank obtained possession of the disputed collateral and notified Caterpillar it intended to sell the collateral for $2,500,000.00. Caterpillar did not object to the sale but reserved the right to later seek damages against The Bank. On May 12, 2010, Eagle River Coal purchased the collateral for $2,500,000.00 at a private sale. The evidence is that this was a good price for the collateral.

The Bank retained $5,300.00 for the expense of conducting the sale and sent a check for "surplus" funds to Peabody. Peabody refused the check and instructed The Bank to send these funds to Caterpillar. The Bank then issued a check to Caterpillar in the amount of $1,097,887.16. On the memo line of the check, The Bank inserted the language "satisfaction of subordinate security interest." Caterpillar, not wanting to concede a subordinate interest in the disputed collateral, never indorsed the check. The Bank kept $1,396,812.84 from the sale and applied this money to an

unspecified delinquent loan with S Coal.

Caterpillar abandoned all but two claims before trial. Caterpillar's conversion claim is based on its perfected security interest in the disputed collateral. The tortious interference with contract claim is premised on the escrow agreement and special purpose entity. Neither the escrow agreement nor the special purpose entity were ever placed of record by any public filing. It is also important to note The Bank was not a party to either the escrow agreement or special purpose entity.

Caterpillar claims The Bank converted its collateral when The Bank: (1) told Caterpillar any attempt to take possession of its collateral would constitute a breach of peace; (2) asserted title to the collateral free and clear of Caterpillar's security interest; and (3) sold the collateral at a private sale and applied the proceeds to an unspecified delinquent loan. The Bank's defense to the conversion claim is that The Bank acquired a superior interest in the disputed collateral through the 2008 security agreement with S Coal and through the subordination agreement from Peabody.

Caterpillar claims The Bank committed tortious interference with contract when The Bank tried to obtain a superior security interest in the disputed collateral from S Coal. According to Caterpillar, The Bank had constructive notice of the escrow agreement and special purpose entity through Caterpillar's 2006 financing statement. However, The Bank says it never had notice of the escrow agreement or special purpose entity. The Bank always thought S coal had title to the collateral. After all, S Coal depreciated the collateral on its tax returns, and the tax returns were a basis for making the loan in 2008.

## II. ANALYSIS

*A. Conversion*

The tort of conversion is premised on the wrongful deprivation of property to the detriment of the owner or person entitled to possession. *See Cruthis v. Firstar Bank, N.A.* 822 N.E. 2d 454, 462 (5th Dist. 2004). Here, no one disputes that after S Coal's refinancing in 2006, Caterpillar was a secured creditor with an interest in the disputed collateral. The Bank claims, however, it acquired a superior interest in the disputed collateral in 2008. If The Bank's argument is true, then Caterpillar's claim for conversion fails.

First, The Court must determine what interest, if any, The Bank had in the disputed collateral. The Illinois Commercial Code is clear on what it takes to transfer a security interest in collateral:

> A security interest is enforceable against the debtor and third parties with respect to the collateral only if (1) value has been given; (2) the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party; and (3) one of the following conditions is met: (A) the debtor has authenticated a security agreement that provides a description of the collateral . . . .

810 ILCS 5/9-203(b).

In 2008, The Bank gave value to S Coal through the additional loan. The question then becomes: what interest did S Coal transfer in return to The Bank? Although S Coal passed title to the collateral to PECEC in 2006, that does not mean S Coal did not retain *some* interest in the collateral. S Coal, arguably, transferred whatever interest it had in the collateral in 2008 to The Bank. If the special purpose entity worked as intended, it would supplant Article 9 of the Uniform Commercial Code. This Court is skeptical of such a result.

The Bank's real problem is (3)(A): "the debtor has authenticated a security agreement that provides a description of the collateral." The Bank produced the 2005 financing statement between Peabody and S Coal, but never came up with the 2005 security agreement recited in the financing statement. The financing statement is not enough. Absent the security agreement signed by the debtor (S Coal), it is impossible to determine what interest, if any, Peabody passed to The Bank through the subordination agreement. The subordination agreement is the lynchpin of The Bank's claimed superior position in the disputed collateral. Therefore, The Bank does not have a superior interest in the disputed collateral. *See Helms v. Certified Packaging Corp.*, 551 F.3d 675, 680 (7th Cir. 2008)("A prudent potential creditor would have requested a copy of the security agreement . . . [because] [t]he security agreement is the document which creates the security interest.")

Next, the Court must examine whether Caterpillar carried its burden of proof on the conversion claim. An "action for conversion is a proper remedy for a secured party to bring against a third party when its collateral has been disposed of by the debtor." *Id.* at 678 (quoting *Taylor Rental Corp. v. J.I. Case Co.*, 749 F.2d 1526, 1529 (11th Cir. 1985)).

> To prove the tort of conversion, a plaintiff must establish that (1) he has a right to the property; (2) he has an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property.

*Cirrincione v. Johnson,* 703 N.E. 2d 67, 70 (1998).

Caterpillar had a security interest in the collateral. "After default, a secured party (1) may take possession of the collateral; and (2) without removal, may render equipment unusable and dispose of the collateral on a debtor's premises . . . ." 810 ILCS 5/9-609(1)-(2). Since Caterpillar's interest in the collateral was superior to any interest The Bank arguably had in the collateral, S

Coal's default gave Caterpillar an absolute and unconditional right to immediate possession of the disputed collateral.

Caterpillar made several demands for possession of the collateral. The first demand came when Caterpillar's corporate counsel attempted to negotiate directly with The Bank through the exchange of e-mails. When Caterpillar requested access to the collateral, The Bank insouciantly replied that any attempt to take possession of the collateral would constitute a breach of the peace.

The evidence clearly establishes The Bank wrongfully exerted dominion and control over the collateral. To establish wrongful dominion or control, it is *not* necessary to show "malice, culpability or conscious wrongdoing." *Landfield Finance Co. v. Feinerman*, 279 N.E.2d 30, 33 (1st Dist. 1972). "All that is required is the exercise of control by the defendant over the chattel in a manner inconsistent with the plaintiff's right of possession." *Id*.

The Bank obtained possession of and exercised control over the collateral after S Coal defaulted. The Bank never had Caterpillar's consent to obtain possession of the collateral. If this were not enough, The Bank then obtained a bill of sale from S Coal and asserted free and clear title to the collateral as if Caterpillar's interest did not exist.

After the sale of collateral, The Bank exercised exclusive control over the proceeds. In general, proceeds are "whatever is acquired upon the sale . . . of collateral." 810 ILCS 5/9-102(64)(A). "A security interest in proceeds is a perfected security interest if the security interest in the original collateral was perfected." 810 ILCS 5/9-315(c). Caterpillar had a perfected secured interest in the collateral. Therefore, Caterpillar's perfected security interest continued in the proceeds. A "perfected security interest in the proceeds" will become unperfected unless "the proceeds are identifiable cash proceeds." 810 ILCS 5/9-315(d)(2). Here, the proceeds are

identifiable cash proceeds. Accordingly, Caterpillar continues to have a perfected security interest in the proceeds.

S Coal's default gave Caterpillar an absolute and unconditional right to immediate possession of its collateral. The Bank, however, obtained possession of the collateral and exerted dominion and control over the collateral and its proceeds. Caterpillar carried its burden of proof on its claim for conversion.

### *B. Tortious Interference with Contract*

In Illinois, the elements of a cause of action for "tortious interference with contract are: '[1] a valid contract, [2] defendant's knowledge of the existence of the contract, [3] defendant's intentional and malicious inducement of the breach of the contract, [4] breach of contract caused by defendant's wrongful conduct, and [5] resultant damages to the plaintiff.'" *George A. Fuller Co., Div. of Northrop Corp. v. Chicago College of Osteopathic Medicine*, 719 F.2d 1326, 1330 (7th Cir. 1983) (quoting *Swager v. Couri*, 376 N.E.2d 456, 459 (3d Dist. 1978) *aff'd*, 395 N.E.2d 921 (1979)).

The escrow agreement and special purpose entity constitute a valid contract. But Caterpillar must also show The Bank knew "of the existence of the contract or that [The Bank] knew of facts from which a contract could reasonably have been inferred . . . ." *Wheel Masters, Inc., v. Jiffy Metal Prod. Co.*, 955 F. 2d 1126, 1130 (7th Cir. 1992). Although "the actor's conduct is in fact the cause of another's failure to perform a contract, the actor does not induce or otherwise intentionally cause that failure if he has no knowledge of the contract." Restatement (Second) of Torts § 766, comment i.

Here, there is no evidence The Bank had knowledge of the escrow agreement and special purpose entity. The Bank was not a party to either the escrow agreement or the special purpose

entity. Neither the escrow agreement nor the special purpose entity were ever placed of record by any public filing. The law simply does not support Caterpillar's claim that a financing statement, which recites a security agreement, gives notice to all the world of a related escrow agreement. Nor can The Bank be expected to infer the existence of an escrow agreement and special purpose entity from a financing statement that recites a security agreement. Rather, the purpose of a financing statement is to provide notice to the world "that a creditor has a security interest in the debtor's property" and nothing more. *Helms*, 551 F.3d at 680. Caterpillar did not prove The Bank intentionally interfered with Caterpillar's contract with S Coal.

## *C. Damages*

The party seeking to recover bears the burden of proving damages to a "reasonable degree of certainty." *Telemark Dev. Group v. Mengelt*, 313 F. 3d 972, 983 (7th Cir. 2002). "Generally the measure of damages for conversion of personal property is the market value of the property at the time and place of conversion plus legal interest." *Jensen v. Chciago & W.I.R. Co.*, 419 N.E. 2d 578, 593 (1st Dist. 1981). Here, however, a diversion from the general rule is necessary. Caterpillar had a perfected secured interest in the collateral. Caterpillar's security interest never became unperfected after the sale to Eagle River Coal because"the proceeds are identifiable cash proceeds." 810 ILCS 5/9-315(d)(2). Caterpillar's damages are the identifiable cash proceeds it had a perfected security in after the sale of collateral.

The sale price of the collateral was $2,500,000.00. Caterpillar concedes it had no interest in one piece of equipment sold to Eagle River Coal; the Modular Prep Plant. The Modular Prep Plant totaled four percent of the net sales price, which is $101,686.14. Caterpillar's damages for conversion do not include the value of the Modular Prep Plant. Accordingly, the damages for

conversion are $2,398,313.86.

Caterpillar had an absolute and unconditional right to immediate possession of the collateral upon S Coal's default. Therefore, pre-judgment interest is appropriate. Pre-judgment interest shall be awarded at a rate of 1.93%, which is the 2010 average market yield on U.S. Treasury securities at 5-year constant maturity. The average for 2010 is appropriate because Caterpillar's first demand for the collateral came on February 25, 2010. On that date, Caterpillar's corporate counsel attempted to directly negotiate with The Bank through the exchange of e-mails. Accordingly, pre-judgment interest shall be measured from February 25, 2010.

Caterpillar claims it is entitled to punitive damages. The Court disagrees. "Illinois courts do not favor punitive damages and insist that plaintiffs must establish . . . extraordinary or exceptional circumstances clearly showing malice or willfulness." *Europlast, Ltd. v. Oak Switch Sys.,* 10 F.3d 1266, 1276 (7th Cir. 1993) (internal quotation omitted). The Illinois Supreme Court has stated "[b]ecause of their penal nature, punitive damages are not favored in the law, and courts must be cautious in seeing that they are not improperly or unwisely awarded." *Deal v. Byford*, 537 N.E.2d 267, 272 (1989); *Kelsay v. Motorola, Inc*., 384 N.E.2d 353, 359 (1978)("It has long been established in this State that punitive or exemplary damages may be awarded when torts are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others."); *Home Sav. & Loan Ass'n of Joliet v. Schneider*, 483 N.E.2d 1225, 1228 (1985) ("[D]eceit alone cannot support a punitive damage award, such damages may be allowed . . . [in] extraordinary or exceptional circumstances clearly showing malice and willfulness.").

Here, Caterpillar has failed to show any evidence The Bank acted with malice or wilfulness. The Bank made a costly mistake of law thinking it purchased Peabody's superior interest without obtaining the underlying security agreement. Caterpillar was similarly negligent when it failed to obtain Peabody's interest in 2006. The price for negligence is an award of damages and here there are no exceptional circumstances such that punitive damages are appropriate.

### III CONCLUSION

Caterpillar failed to prove The Bank intentionally interfered with Caterpillar's contract. The Bank is not liable to Caterpillar for tortious interference with contract. Caterpillar carried its burden of proof on its claim for conversion. The Bank is liable to Caterpillar for conversion in the amount of $2,398,313.86, with pre-judgment interest at a rate of 1.93%, to be computed from February 25, 2010. There are no exceptional circumstances and an award of punitive damages is not appropriate. An award of attorneys' fees is also inappropriate in this case. In accordance with Federal Rule of Procedure 58(a), judgment for this matter is entered on a separate document.

**IT IS SO ORDERED.**

DATED: June 28, 2012

/s/ *G. Patrick Murphy*
G. PATRICK MURPHY
United States District Judge